**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| HANOVER AMERICAN INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:20-cv-02834-JPM-cgc |
| v. | ) ) | |
| TATTOOED MILLIONAIRE ENTERTAINMENT, LLC, CHRISTOPHER C. BROWN, AND JOHN FALLS, | ) ) ) ) ) | |
| Defendants. | | |

**MEMORANDUM OF DECISION**

Before the Court is the interpleader case of Hanover American Insurance Company ("Hanover") vs. Tattooed Millionaire Entertainment, LLC ("TME"), Christopher C. Brown ("Brown"), and John Falls ("Falls"). The non-jury trial was held before this Court on January 23, 2024. (ECF No. 154.) The Court having considered all the pretrial decisions and filings, the official trial transcript (ECF No. 156), and the post-trial filings (ECF Nos. 157-63), for the reasons discussed below **HOLDS**:

- John Falls is entitled to recover $2,066,217.30 of the BPP;

- In light of Tennessee public policy, Brown/TME are not entitled to the remainder of the BPP; and

- Intervenors' claim is moot.

1

## II.     BACKGROUND

### A.  Brief Background

The instant case is an interpleader action arising out of a jury trial in Hanover Am. Ins. Co. v Tattooed Millionaire Entertainment, LLC, No. 2:16-cv-02817-JPM-tmp (W.D. Tenn. 2016) ("Hanover I").  (ECF No. 1 at PageID 2.)   In Hanover I, a jury trial was held on "insurance claims submitted to Hanover [by Defendants in the instant case] in connection with a 2015 arson fire and alleged theft at the House of Blues recording studio located on Rayner Street in Memphis, Tennessee."  (ECF No. 101-1 at PageID 1405.)  The Hanover I jury held that (1) Christopher C. Brown ("Brown") and Tattooed Millionaire Entertainment, LLC ("TME") were indistinguishable; and (2) Brown/TME made material misrepresentations with the intent to deceive and committed unlawful insurance acts during the claims process, and thus Hanover was entitled to recover the advance payments made to Brown/TME.   (See Hanover I, ECF No. 312.)  The Hanover I jury also held that Falls did not make material misrepresentations or commit unlawful insurance acts, and thus awarded him the maximum amount covered by his policy: $2.5 million in Business Personal Property ("BPP") and an additional $250,000[1] in Business Income ("BI").  Id.

After the jury trial concluded, this Court granted Hanover's Rule 50(b) motion for judgment notwithstanding the verdict and entered an amended judgment denying Falls' recovery.   The Sixth Circuit, however, reversed the post-trial ruling and remanded with instructions to reinstate the jury verdict as to Falls, which this Court did.  See Hanover Am. Ins. Co. v. Tattooed Millionaire Entertainment, LLC, 974 F.3d 767 (6th Cir. 2020) (Hanover 6th Cir. Decision); (Hanover I, ECF No. 104-8.)   The Sixth Circuit opinion stated that

---

[1] This sum was additional to the $250,000 advance payment which Mr. Falls received from Hanover before Hanover I action was initiated.

"Hanover clearly accepted at trial [in <u>Hanover I</u>] that Falls had at least an arguable property interest: Barkman testified at trial that the payment for BPP under the Falls policy would go to Falls and Brown jointly." <u>Hanover 6th Cir. Decision</u> at 790-1.  The Sixth Circuit also noted that "Hanover could have objected and requested a jury instruction as to whether Brown's misbehavior could void Falls' policy.  It could have requested that the verdict for <u>Hanover I</u> be structured to tie the issues together.  It did neither," but instead tried to address the issue on appeal.  <u>Id.</u> at 788.  "Behavior of this sort, sometimes called 'lying in the weeds' or 'sandbagging,' should be strongly discouraged." <u>Id.</u>

In the instant case ("<u>Hanover II</u>") Hanover filed its Complaint for interpleader and declaratory relief on November 16, 2020.  (ECF No. 1.)  Hanover claims that the $2.5 million BPP insurance awarded to Falls is subject to multiple competing claims.  (<u>Id.</u> at PageID 3.) Hanover's Complaint seeks a declaration that the $2.5 million BPP award is null and void as a matter of Tennessee public policy, or in the alternative, asks the Court to resolve the various competing claims to the BPP insurance proceeds and declare to whom, and in what amount, those funds should be paid.  (<u>Id.</u> at PageID 6-10.)

Since the action has been filed, both Falls and Brown/TME filed Answers and Counterclaims asserting that they are entitled to the BPP insurance proceeds.  (ECF Nos. 70, 78.)  Falls' attorney also filed an Intervenor Complaint asserting a claim for attorneys' fees against Brown/TME if Brown/TME is found to be entitled to the disputed funds.  (ECF No. 62.)

     *B.  Stipulated to Facts*

Prior to trial on January 23, 2024 in the instant case, the Parties stipulated to the following facts during pre-trial conference on January 12, 2024:

1.      John Falls leased Studio B at the former House of Blues studio located on Rayner Street in Memphis, Tennessee, and the equipment therein from Christopher Brown who owned TME.  (ECF No. 153 at PageID 4315.)

2.      Falls obtained insurance from Hanover that included, *inter alia*, $2.5 million in coverage for BPP and $500,000 in coverage for BI.  (Id.)

3.      Brown/TME had a separate policy that covered, *inter alia*, the structure of the studio building.  (Id.)

4.      On November 5, 2015, an arson fire occurred at the House of Blues recording studio located on Rayner Street in Memphis, Tennessee, causing substantial damage to the building and the BPP therein. (Id.)

5.      The evidence presented at the trial of the original action (Hanover I) established that Brown/TME falsified documents and submitted fake invoices, phony receipts, and doctored bank account statements in connection with the insurance claims following the fire.  Brown admitted as much when he agreed that "[a]ll of the vendor information on this theft list is false" and that "if we looked at the one for Studio B and John Falls, all the vendor information on the theft claim would be false."  (Id. at PageID 4315-6.)

6.      At the trial of the original action, the jury found that Brown/TME made material misrepresentations with the intent to deceive and committed unlawful insurance acts during the claims process.  The jury also found that Brown and TME are indistinguishable, such that TME may be disregarded, and liability imposed on Brown.  Based on these findings, the jury determined that Hanover was entitled to recover the advance payments that had been made to Brown/TME ($2,208,898.49).  (Id. at PageID 4316.)

7.   At trial of the original action, the jury found in favor of Falls and awarded him $2.5 million in BPP and an additional $250,000 in BI, which was the remainder owed for the $500,000 in BI coverage.  (Id.)

8.   The jury in <u>Hanover I</u> found that Falls did not (1) "make a material misrepresentation on the insurance application; (2) "make a material misrepresentation of the loss"; or (3) "commit or cause to be committed an unlawful insurance act concerning his application for insurance or in making a claim for payment of the loss to Hanover American Insurance Company."  (Id.)

9.   In the appeal regarding the original action, the Sixth Circuit wrote:

> The jury awarded Falls $2,500,000 as the amount of insurance he was owed, up to his policy limit, for Business Personal Property coverage . . .. The BPP payment covers the loss of the gear in Falls' studio.  However, Brown is the ultimate owner of the lost gear, on which Falls had a perpetually renewable leasehold.

> Therefore, Hanover argues, payment of the $2,500,000 would violate public policy, because Brown would ultimately benefit from his own wrongdoing.  It is an "ancient equity maxim that no one should benefit from his own wrongdoing." *K & T*, 97 F.3d at 178.  The Supreme Court of Tennessee recognized the application of this principle in insurance cases in *Box v. Lanier*, 79 S.W. 1042, 1045 (Tenn. 1904).  "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." <u>Id.</u>

> The public-policy argument, however, even if accepted, does not mean that Falls takes nothing of the $2,500,000 BPP award.  Falls had a property interest in the "gear," in the form of his leasehold with unlimited renewal options.  Leaseholds have been held to be insurable interests.  More to the point, Hanover clearly accepted at trial that Falls had at least an arguable property interest:  [Hanover witness] Barkman testified at trial that the payment for BPP under the Falls policy would go to Falls and Brown jointly.  Thus, Barkman said, it would have to be endorsed by Brown to be cashed by Falls.  As Falls' counsel explained to us at oral argument, the proceeds will become the subject of an interpleader action between Falls, Brown, Hanover, and Brown's other creditors.

> This was the district court's plan for how to handle the issue: Falls and TME would "sue each other" in the event of a win, but not fight it out during the main trial.  Though Falls and Hanover both make interesting legal arguments as to the disposition of the funds, we see no reason to short-circuit that plan.  Such arguments can be made in whatever subsequent proceedings arise over this payment.

(Id. at PageID 4316-7.)

10.     The Second Amended Judgment in Hanover I states in relevant part that (i) "[a] Judgment is entered against Hanover…and for…Falls in the amount of $250,000 for…[BI] coverage under the Falls insurance policy," and (ii) "[a] Judgment is entered against Hanover… and for…Falls in the amount of $2,500,000 for…[BPP] coverage under the Falls insurance policy, for which…[TME] is listed in the policy as having an 'Additional Interest' for 'Loss Payable' for 'All Insured BPP.'"  (Id. at PageID 4317.)

11.     Hanover has now paid Falls the full $500,000 limit of his BI insurance.  (Id.)

12.     Brown/TME is the sole owner of the gear insured by the Falls policy subject to the leasehold interest held by Falls. (Id.)

13.     The Falls Equipment Lease required Falls to insure the gear for "at least $2,500,000." (Id. at PageID 4318.)

14.     The plain terms of the Falls policy indicate that TME (the owner of the insured gear subject to Falls' leasehold) is listed under the "Property Schedule of Additional Interest" as a "Loss Payable" for "ALL INSURED BPP."  The Falls policy contains a "Property Schedule of Additional Interest," which provides as follows (Id. (citing ECF No. 100-3, Page ID 1434)):

```
Location: 1  Building: 1              Location: 1  Building: 1
Loss Payable                          Lenders Loss Payable
TATTOOED MILLIONAIRE                  TATTOOED MILLIONAIRE
ENTERTAINMENT, LLC                    ENTERTAINMENT, LLC
682 ROCKY FIELD COVE                  682 ROCKY FIELD COVE
CORDOVA TN 38018                      CORDOVA TN 38018
ALL INSURED BPP
```

(Id.)

15.     Additionally, the Falls policy contains an endorsement that adds specific "Loss

Payable Provisions" to the policy, including the following (Id. (citing ECF No. 100-3, Page

ID 1553-1555)):

**1. Loss Payable Clause**

For Covered Property in which both you and a Loss Payee shown in the
Schedule or in the Declarations have an insurable interest, we will:

a. Adjust losses with you; and

b. Pay any claim for loss or damage jointly to you and the Loss Payee,
as interests may appear.

(Id.)

16.     Falls has not paid rent to Brown/TME under the studio lease, or the equipment

lease since the fire in November 2015.  (Id. (citing ECF No. 100-8, Page ID # 1618).)

17.     Falls did not have property insurance on the studio.  (Id. (citing ECF No. 100-

3, Page ID # 1428-1586).)

18.     Falls has had a full-time job as general manager of a construction company

since 2018.  (Id. (citing ECF No. 100-8, Page ID # 1616).)

19.     As of September 22, 2023, Falls has not filed federal income tax returns since

2014.  (Id. at PageID 4319 (citing ECF 100-8, Page ID # 1615).)

20.     In 2020, Brown was indicted for mail fraud in connection with various insurance fraud schemes, including the one involving Hanover.  On September 13, 2023, Brown entered a plea of guilty to Count 4 of the indictment, which charged a violation of Title 18, United States Code, Section 1341, with respect to the insurance proceeds that Brown had obtained from Hanover under false pretenses. (Id. (citing United States of America v. Christopher C. Brown, Criminal Action No. 2:20-cr-20245 (W.D. Tenn.)).)

21.     Although the relevance and impact of the judgment is disputed, on November 29, 2023, the Shelby County Circuit Court entered a judgment in John Falls v. Christopher C. Brown, Tattooed Millionaire Entertainment, LLC, and Tattooed Millionaire Records, Case No. T-3322-20 (Shelby County Circuit Court Nov. 28, 2023), holding that Falls was entitled to $1,575,000.00 of the $2.5 million BPP award in Hanover I and Brown/TME was entitled to $925,000 (subject to Hanover's claim).  (Id. (citing ECF 142-1).)

22.     Hanover was not a party to John Falls v. Christopher C. Brown, Tattooed Millionaire Entertainment, LLC, and Tattooed Millionaire Records, Case No. T-3322-20 (Shelby County Circuit Court Nov. 28, 2023).  (Id.)

C.  The Court's Previous Rulings

On October 23, 2023, the Court ruled on several Summary Judgment motions.  (See ECF No. 137.)  In its ruling the Court held that claim preclusion prevents "Hanover from asserting claims or arguments against Falls regarding his interests in BPP but does not prevent Hanover from pursuing claims and arguments against TME/Brown."  (Id. at PageID 4137.) The Court also dismissed TME/Brown's counterclaim for conversion against Hanover.  (Id. at PageID 4139-41.)   The Court thus incorporates the rulings from the Order on Summary Judgment motions into this Memorandum.  (ECF No. 137.)

## II.    ANALYSIS

Given the complexity of this case, before analyzing the issues that need to be resolved in this trial the Court provides a short summary of Parties' arguments and dismisses some based on previous rulings.

### A.  Party Arguments

#### i.    Hanover's Arguments

Throughout this interpleader action, Hanover argues that this Court should: (1) "declar[e] that John Falls is not entitled to any portion of the [BPP] insurance proceeds that were awarded by the jury in <u>Hanover I</u> or, alternatively, declaring that Falls is only entitled to a de minimis portion of those proceeds;" (2) "declar[e] that Brown/TME would otherwise be entitled to the balance of the BPP insurance proceeds, but that payment of the BPP insurance proceeds to Brown/TME would violate Tennessee public policy or, alternatively, that Hanover is entitled to a set-off against Brown/TME, such that Hanover is relieved of any obligation to make such payment;" and (3) "dismiss[] the intervenor complaint of Futhey and Morris with prejudice."  (<u>See e.g.</u>, ECF No. 157 at PageID 4498-0.)

##### a.  Hanover's Arguments Against Falls' Recovery

To support its argument against John Falls' lack of entitlement to the BPP award, Hanover argues that Brown/TME are the sole owners of the gear and Falls' policy contains a Property Schedule of Additional Interest that lists TME under Loss Payable for All insured BPP.  (<u>Id.</u> at PageID 4503.)  Alternatively, Hanover argues that Fall's Interest in the BPP should be de minimis and as such was already covered by the BI payment he received under the policy.  (<u>Id.</u> at PageID 4507-10.)

This Court has already considered Hanover's arguments against Falls' recovery in Hanover's Summary Judgment Motion.  (See ECF No. 137 ("Summary Judgment Order").) There the Court ruled that claim preclusion prevents "Hanover from asserting claims or arguments against Falls regarding his interests in BPP but does not prevent Hanover from pursuing claims and arguments against TME/Brown."  (Id. at PageID 4137.)  Hanover attempts to undermine this clear language, by selecting individual sentences from the Summary Judgment Order, that when taken out of context, could provide some wiggle-room for Hanover to present its arguments against Falls.  (ECF No. 161 at PageID 4559-60.)  This piecemeal approach to interpreting the Court's order will not work.  The Court clearly and unequivocally held that Hanover's arguments against Falls' recovery are precluded.  (ECF No. 137 at PageID 4137.)

As the Sixth Circuit noted in Hanover I "Hanover could have objected and requested a jury instruction as to whether Brown's misbehavior could void Falls' policy.  It could have requested that the verdict for Hanover I be structured to tie the issues together.  It did neither." Hanover 6th Cir. Decision at 788.  The Court thus incorporates its reasoning from the Summary Judgment Order into this Memorandum, and will not further address these arguments as they are precluded by holdings in Hanover I.  (See ECF No. 137.)

### b.  Hanover's Arguments Against TME/Brown's Recovery

Hanover argued both in this case and in the appeal to the Sixth Circuit that Brown/TME, although entitled to the BPP award in full under the policy, should not be able to recover due to Brown/TME's fraud.  (See e.g., ECF No. 157 at PageID 4505-7.)  Hanover's argument rests on the premise that it "would violate [Tennessee] public policy to permit recovery under an insurance policy to a wrongdoer who would thereby benefit from his own

wrongdoing." (Id. at PageID 4506.)  In its Post-Trial Brief, Hanover notes that the Parties "stipulated to all of the relevant facts regarding the jury's findings in Hanover I as to Brown/TME's insurance fraud, including the fact that Brown's fraud extended to the claim under Falls' policy[.]"  (Id.)  Alternatively, Hanover argues, that any award of BPP to Brown/TME should be set-off against their outstanding unpaid judgment from Hanover I.  (Id. at PageID 4507.)

### c.  Hanover's Arguments to Dismiss Intervenors' Complaint

Finally, Hanover argues that Intervenors' Complaint should be dismissed with prejudice because: (1) if payment of BPP proceeds to Brown/TME violates Tennessee public policy, the intervenors have no claim; and (2) neither Mr. Futhey nor Mr. Morris represented Brown/TME during Hanover I, and the common fund doctrine does not apply to the circumstances in the case.  (Id. at PageID 4511-2; ECF No. 161 at PageID 4561-2.)

### ii.  Brown/TME's Arguments

Throughout this interpleader Brown/TME argue that Falls is not entitled to any portion of the BPP proceeds because: (1) TME is the sole loss payee for the BPP coverage; and (2) Falls' leasehold interest terminated at the time of the fire.  (See e.g., ECF No. 158.) Brown/TME argue that TME is the sole loss payee for the BPP coverage because of the Property Schedule of Additional Interest in the Falls' policy that lists TME under Loss Payable for All insured BPP.  (Id. at PageID 4517.)  Brown/TME further argue that "[a]s the Court of Appeals of Tennessee has explained, '[g]enerally a loss payable clause provides that proceeds of an insurance policy are to be paid first to the designated loss payee rather than to the named insured."  (Id. (citing Union Planters Nat'l Bank v. Am. Home Assurance Co., 2002 WL 1308344 *4 (Tenn. Ct. App. Mar. 18, 2002).)).

11

Brown/TME also argue that Falls' leasehold interest terminated at the time of the fire because "it has been the established law in Tennessee that when leased property is destroyed, 'destruction by fire or other cause puts an end to the contract.'"  (<u>Id.</u> at PageID 4518 (citing <u>Post v. Brown</u>, 218 S. W. 823, 824 (Tenn. 1920).  Brown/TME argue that Falls' renewal option never materialized because of this termination, and that Falls "recognized this because he made no lease payments under the contracts after the fire."  (<u>Id.</u> at PageID 4518-9.)

Brown/TME argue that the opinion of the expert witness proffered by Falls for calculation of damages assumes that Falls "could have renewed his lease through 2030[,]" and thus is flawed because "[t]he Tennessee Supreme Court has held that 'an option to renew remains effective only during the term of the lease.'"  (<u>Id.</u> (citing <u>Norton v. McCaskill</u>, 12 S. W. 3D 787, 790 (Tenn. 2000).).)  Brown/TME further argues that given that Falls' lease terminated with the fire, then Falls no longer had a right to renew his lease.  (<u>Id.</u>)

       *iii.*    *Falls' Arguments*

At trial and throughout its filings Falls argues that: (1) Hanover is barred through claim preclusion from contesting whether or how much Falls should recover; and (2) "[s]tate court's decision in *Falls v. Brown* binds Brown/TME as well as Falls to the holding that Falls' leasehold interest is worth $1.575 million and Brown's remainder interest is worth $975,000." (ECF No. 159 at 4523-4.)  Alternatively Falls argues that the Court should find that Falls' leasehold interest with unlimited renewal options is worth up to $2,126,000 based on the expert evidence presented. (<u>Id.</u> at PageID 4524.)

### a. *Falls' Argument For Claim Preclusion*

As the Court stated above, the claim preclusion arguments were addressed in the Summary Judgment Order and thus will not be further analyzed here.  <u>See</u> <u>supra</u> Section II(A)(i)(a).

### b. *Falls' Argument Regarding State Court Decision*

Falls argues that under 28 U.S.C. § 1738 a state court's judgment is entitled to full faith and credit from a federal court.  (<u>ECF No. 151</u> at PageID 4271.)  Here, Falls argues that the Court should give full faith and credit to a judgment rendered by a Tennessee State Court in <u>Falls v. Brown</u>, Case Number T-3322-20 (Shelby Country Circuit Court 2020) awarding him $1,575,000.00 of the BPP.  (<u>Id.</u> at PageID 4271-2.)

### c. *Falls' Argument Regarding Leasehold Valuation*

First, Falls argues that his leasehold did not terminate at the time of the fire because "Tennessee courts have acknowledged that where a lease requires insurance, a fire does not terminate the lease."  (ECF No. 159 at PageID 4532 (citing <u>Taylor v. White Stores, Inc.</u>, 707 S.W.2d 514, 516 (Tenn. Ct. App. 1985)).)  Falls further argues that his nonpayment of rent after the fire did not terminate the lease because Falls' "duty to pay rent abated until Brown restored the property, which Brown still has not done."  (<u>Id.</u> at PageID 4533.)

Second, Falls argues that his policy entitles him to recovery of the BPP payment because the Loss Payable Clause states that the insurer will "Pay any claim for loss or damage jointly to [the insured] and the Loss Payee as interests may appear."  (<u>Id.</u> at PageID 4534.)

Third, Falls argues that his experts have properly estimated the value of his leasehold interest in the BPP.  (<u>Id.</u> at PageID 4535.) Falls argues that an income-basis valuation may be

used generally to determine the value of a property interest, and thus Robert Vance's expert testimony and reports clearly establish the value of Falls' leasehold interest. (Id.)

Fourth, Falls argues that Brown/TME are not entitled to any remedies because they committed the first material breach by failing to restore Studio B or the equipment after the fire. (Id. at PageID 4537.)

iv.   *Falls' Arguments*

The Intervenors (Futhey Law Firm PLC, Malcom B. Futhey III, and Parke Morris) argue that if Brown/TME are allowed to recover any part of the BPP, the intervenors should be awarded attorney's fees based on the common fund doctrine. (See e.g., ECF No. 160.)

B.   *Lease Termination*

The Supreme Court of Tennessee held that "where the damage is such as to cause a temporary interruption of the use of the property, which may be remedied with reasonable dispatch, the lease is not terminated, and, upon repair being made by the lessor, the lessee is obligated to the payment of the stipulated rent. The mere impairment of a use as distinguished from its destruction does not deprive the lessee of all interest, and correspondingly does not relieve him from all liability." Post v. Brown, 218 S.W. 823, 824 (1920).

Here, during trial both Falls and Brown testified that they expected the interruption to their business to be temporary and both hoped to get back in the studio. (ECF No. 156 at PageID 4367; 4444.) Furthermore, Brown himself testified that he hopes to repair the studio someday. (Id. at PageID 4389-90.) Both Falls' and Brown's testimonies support the finding of fact that the damage caused by the fire was expected to cause only a "temporary interruption of the use of the property." Post, 218 S.W. at 824. Furthermore, Brown has testified that he never provided written notice of default to Falls, despite the fact that the retail

lease had a provision that required such written notice.  (ECF No. 156 at PageID 4385.)   The Court thus finds that Falls' lease did not terminate at the time of the fire.   Furthermore, Falls was not required to pay for the lease because he never regained use of the leased property.  Post, 218 S.W. at 824.

### C.  Contract Language

"[Q]uestions regarding the extent of insurance coverage present issues of law involving the interpretation of contractual language" contained in the policies.  Garrison v. Bickford, 377 S.W.3d 659, 663-64 (Tenn. 2012).  Under Tennessee law, insurance policies must be construed "as a whole in a reasonable and logical manner."  Id. at 664.  "Insurance contracts are subject to the same rules of construction as contracts generally, and . . . the contractual terms should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties."  Clark v. Sputniks, LLC, 368 S.W.3d 431, 441 (Tenn. 2012) (internal quotations omitted).  Insurance policies are contracts that "are strictly construed in favor of the insured."  S. Trust Ins. Co. v. Phillips, 474 S.W.3d 660, 664-65 (Tenn. 2015) (quoting Garrison, 377 S.W.3d at 663-64).

In the Pretrial Order, the Parties have stipulated that the Loss Payable Clause and the Property Schedule of Additional Interest are the two key parts of Falls' insurance policy. (ECF No. 153 at PageID 4318.)  The Property Schedule of Additional Interest states that Loss Payable for All insured BPP goes to TME.  (ECF No. 100-3 at PageID 1434.)  The Loss Payable Clause, on the other hand states that "[f]or Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will: (a) Adjust losses with you; and (b) Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear."  (Id. at PageID 1554.)  The language preceding the Loss

Payable Clause states that "[t]he following is added to the Loss Payment Loss Condition, as indicated in the Declarations or in the Schedule[,]" thus clearly indicating intent to modify the Property Schedule of Additional Interests.  (Id.)  Given that the Loss Payable Clause is meant to modify the Schedule, the only logical interpretation is to view the language of the Loss Payable Clause as superseding the language of the Schedule.  The policy thus requires the insurance company to pay out the BPP payment "jointly" to Falls and Brown/TME "as interests may appear."  (Id.)

### D.  Interests in BPP

The key determination in this case is thus whether and what type of interest did Falls have regarding the BPP.  As the Sixth Circuit already noted "Falls had a property interest in the 'gear,' in the form of his leasehold with unlimited renewal options.  Leaseholds have been held to be insurable interests."  Hanover 6th Cir. Decision at 788.  The key inquiry therefore is what was Falls' interest worth.

There are generally two ways a property interest can be valued: (1) an income-basis valuation; and (2) a market comparison approach.  See e.g., Seaton v. Tenn State Bd. of Equalization, No. E1998-00880-COA-R3-CV, 2000 WL 852123, at *1 (Tenn. Ct. App. June 28, 2000); In re Sept. 11 Litig., 802 F.3d 314, 335 (2d Cir. 2015).  Falls was the only party who offered an expert witness (Robert Vance) to provide valuation of Falls' leasehold interest.  (ECF No. 159 at PageID 4528.)  Vance's testimony and expert reports relied on another expert's (Pete Matthews) opinion regarding anticipatable reasonable revenue from 2015.[2]  (ECF No. 156 at PageID 4463.)  Vance's expert report calculated the value of Falls' leasehold interest using both an income-based valuation and a market comparison approach.

---

[2] Matthews also testified that a comparable long-term rate for Studio B would equate to $22,500 per month, significantly more than the $1,500 Falls' lease required him to pay for it.  (ECF No. 156 at PageID 4415-6.)

(See generally ECF No. 102-2.)  Vance's calculation concluded that Falls' leasehold interest in both Studio B and the gear was worth up to $2,295,797 through 2030[3].  (Id. at PageID 2076.)  In his supplemental report,[4] Vance then multiplied $2,295,797 value by a factor of 0.926[5] to determine that the value of the gear alone was $2,126,000. (ECF No. 102-7 at PageID 2156.)  Alternatively, to calculate the value of the gear, the Court could apply a 0.90[6] factor to $,2,295,797 resulting in $2,066,217.30 recovery for Falls.

Given that Falls' lease did not terminate with the fire, as explained above, Falls' expert calculation annualizing estimated profits from 2015 is the only plausible way to calculate potential profits.  Furthermore, Falls' lease did not require a written notice to exercise the option to renew, thus causing the lease to extend automatically unless a notice of termination was provided.  (ECF No. 100-4 at PageID 1588.)  The Court thus finds that the 2030 projection resulting in leasehold interest value of $2,295,797 for total lease interest in both Studio B and the gear within is reasonable.  As far as the question of apportionment is concerned, given that during trial Parties raised questions regarding value of Studio B space used by Vance, the Court relies on Falls' testimony assigning ninety percent of earning value

---

[3] During the trial, Vance testified, that the calculations projected profits through 2030 "because Mr. Falls had indefinite renewal options," "although we could have gone longer than that." (ECF No. 156 at PageID 4464.) For a full expert testimony regarding the calculations see ECF No. 156 at PageID 4462-89.  Furthermore, the only argument provided against recovery through 2030 (besides the termination of the lease) noted that Falls obtained alternate employment in 2018, and thus would not be able to run the studio.  (Id. at PageID 4449.)  Falls testified, however, that the studio work is "[p]assive if you're just leasing the space[,]" and "active if you're actually in there working on the material yourself."  (Id. at PageID 4434-5.)  As such the Court found it reasonable that Falls could have held his full-time employment, while also obtaining passive income from leasing of the studio.

[4] In their Post Trial Brief, Hanover raises an issue with the timing of the supplemental expert report.  (ECF No. 157 at PageID 4510, n. 31).  Hanover's arguments against Falls' recovery are precluded, however, as outlined above and in the original Summary Judgment Order.  Furthermore, the Court does not rely on this supplemental calculation for determination of the value of Falls' interest.

[5] "Vance calculated this factor by adding the value of the entire studio space, which was purchased for $200,000 in December 2014, with the value of Studio B's equipment, which was determined to be at least $2.5 million in Hanover I. He then divided the value of the equipment by the total.  ($2.5 million + $200,000 = $2.7 million and the $2.5 million/$2.7 million = 0.926)."  (ECF No. 159 at PageID 4536, n. 4.)

[6] During trial, Falls testified that the value of gear to the Studio B space would be "90/10 in favor of the equipment."  (ECF No. 156 at PageID 4438.)

to the gear.  Falls is thus entitled to recover $2,066,217.30.  (ECF No. 156 at PageID 4438, 4468-9.)

> ### E.  State Court Decision

In its briefings and during trial, Falls has argued that "for better or for worse" he is bound "by the state court decision and asks for a judgment acknowledging his leasehold interest is worth $1.575 million."  (See e.g., ECF No. 159 at PageID 4524.)  On November 29th the Circuit Court of Shelby County, Tennessee for the Thirtieth Judicial District at Memphis issued a ruling in <u>Falls v. Brown</u>, Case No. T-3322-20 (Shelby County Circuit Court Nov. 28, 2023) ("State Court Action").  There the Circuit Court held that Falls was entitled to 1,575,000.00 of the BPP, while Brown was entitled to the remainder.  (ECF No. 142-1 at PageID 4166.)  Hanover was not a party to the case.

Under 28 U.S.C. § 1738, a state court's judgment is entitled to full faith and credit from a federal court.  For "parallel state and federal proceedings, the first to reach judgment will usually bar the other."  <u>William Powell Co. v. Nat'l Indem. Co.</u>, 18 F.4th 856, 872 (6th Cir. 2021).  Under Tennessee law, however, claim preclusion only applies when the movant shows:

> (1) [T]hat the underlying judgment was rendered by a court of competent jurisdiction, (2) **that the same parties or their privies were involved in both suits**, (3) that the same claim or cause of action was asserted in both suits, and (4) that the underlying judgment was final and on the merits.

<u>Jackson v. Smith</u>, 387 S.W.3d 486, 491 (Tenn. 2012) (emphasis added).  Because Hanover was not a party and  could not have been a party to the state court action, claim or issue preclusion cannot apply.  Furthermore, given that these actions did not include the same parties these are not parallel proceedings as required by 28 U.S.C. § 1738.

Thus, although this Court recognizes the importance of giving full faith and credit to parallel state proceedings, the Court cannot do so in this case, as the two proceedings involved different parties.

### F. Public Policy Question

In <u>Box v. Lanier</u>, the Tennessee Supreme Cour held:

> It has been well said that there are certain general and fundamental maxims of the common law which control laws as well as contracts. Among these are: "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are adopted by public policy, and have their foundation in the universal law administered in all civilized countries." These maxims embodied in the common law, and constituting an essential part of its warp and woof, are found announced both in textbooks and in reported cases. Without their recognition and enforcement by the courts, their judgments would excite the indignation of all right-thinking people.

79 S.W. 1042, 1045 (Tenn. 1904). "Pursuant to this doctrine, which has been applied in both civil and criminal cases, the wrongdoer is deemed to have forfeited the benefit that would flow from his or her wrongdoing." <u>Campbell v. Thomas</u>, 897 N.Y.S.2d 460, 469-70 (N.Y. App. Div. 2010) (collecting cases).

Hanover argues that payment of the BPP insurance proceeds to Brown/TME would violate Tennessee public policy because it would allow Brown/TME to benefit from their own wrongdoing. (<u>See e.g.</u>, ECF No. 157 at PageID 4505-6). In <u>Hanover I</u>, jury found that Brown/TME made material misrepresentations with the intent to deceive and committed unlawful insurance acts during the claims process. (<u>See</u> <u>Hanover I</u>, ECF No. 312 (Jury Verdict Form).) In the pre-trial order Brown/TME stipulated that he falsified documents, including vendor information on the claims for Studio B. (ECF No. 153 at PageID 4315).

Brown/TME also stipulated to the fact that Brown pled guilty in connection with this insurance fraud scheme.  (Id. at PageID 4319.)

Because jury in <u>Hanover I</u> found Brown/TME to be interchangeable[7] and Brown himself admitted to fraud in connection with Studio B, awarding Brown/TME any of the BPP profits would go against long standing public policy of not benefitting the wrongdoer for his own wrongdoing.  As such, the Court holds that Brown is not entitled to any of the BPP profits.

### G.  Intervenor's Claim

The Intervenors have argued that "[i]n the unexpected event that TME as loss payee is allowed to apply any portion of Falls' $2.5 million BPP judgment to any debts Brown/TME owes to Hanover, the Court should award Futhey and/or Morris an attorney's fee based on the common fund doctrine."  (ECF No. 160 at PageID 4555.)  As the Court held above, Brown/TME will not be awarded any part of the BPP, and thus Intervenors claim is found as **MOOT**.

### H.  Summary of Court Findings

For the reasons explained above the Court thus **FINDS** that:

- Hanover is precluded from arguing against Falls' recovery;

- Falls' lease for Studio B and equipment therein did not terminate with the fire;

- Loss Payable Clause modifies the language of the Schedule in Fall's insurance contract, requiring Hanover to pay BPP jointly to Falls and Brown/TME as interests may require;

- Falls is entitled to recover $2,066,217.30 for the destroyed/missing BPP;

---

[7] Parties have also stipulated to this fact in the Joint Pretrial Order.  (ECF No. 153 at PageID 4316.)

- The decision in the State Court Action is not binding on this Court;

- Brown/TME are not entitled to recover any part of BPP, as such recovery would violate longstanding Tennessee public policy; and

- Intervenor's claim is moot, given that Brown/TME are unable to recover any of the BPP.

## IV.   CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows:

- Hanover **SHALL** pay John Falls $2,066,217.30 of the BPP;

- Hanover **SHALL NOT** pay or credit the remaining $433,782.7 to Brown/TME; and

- Intervenors' claim is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**, this 4th day of April, 2024.

 /s/ Jon P. McCalla
_____
JON P. McCALLA
UNITED STATES DISTRICT JUDGE