# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Kelly L. Stephens          POTTER STEWART U.S. COURTHOUSE          Tel. (513) 564-7000
Clerk                      CINCINNATI, OHIO 45202-3988            www.ca6.uscourts.gov

Filed:  September 25, 2025

Mr. John Wesley Christopher
Law Office
4780 I-55 N.
Suite 100-14
Jackson, MS 39211

Mr. Mark Dodart
Phelps Dunbar
365 Canal Street
Suite 2000
New Orleans, LA 70130

Mr. Malcolm B. Futhey III
Futhey Law Firm
1440 Poplar Avenue
Memphis, TN 38104

Mr. Jeremy T. Grabill
Phelps Dunbar
365 Canal Street
Suite 2000
New Orleans, LA 70130

Mr. Charles Edgar Waldman
Waldman & Associates
440 N. Front Street
Suite 205
Memphis, TN 38105

Re:     Case No. 24-5452/5453, *Hanover Am. Ins. Co v. Tattooed Millionaire Ent., et al*
        Originating Case No. : 2:20-cv-02834

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Wendy R. Oliver

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

HANOVER AMERICAN INSURANCE COMPANY,

       *Plaintiff-Appellant/Cross-Appellee*,

   *v.*

TATTOOED MILLIONAIRE ENTERTAINMENT, LLC;
CHRISTOPHER C. BROWN,

       *Defendants-Appellees/Cross-Appellants*,

JOHN FALLS,

       *Defendant-Appellee* (24-5452).

Nos. 24-5452/5453

———————————

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:20-cv-02834—Jon Phipps McCalla, District Judge.

Argued: January 30, 2025

Decided and Filed: September 25, 2025

Before: CLAY, GIBBONS, and STRANCH, Circuit Judges.

———————————

### COUNSEL

**ARGUED:** Jeremy T. Grabill, PHELPS DUNBAR LLP, New Orleans, Louisiana, for Hanover American Insurance Company. Malcolm B. Futhey, III, FUTHEY LAW FIRM PLC, Memphis, Tennessee, for John Falls. **ON BRIEF:** Jeremy T. Grabill, Mark C. Dodart, PHELPS DUNBAR LLP, New Orleans, Louisiana, for Hanover American Insurance Company. Malcolm B. Futhey, III, FUTHEY LAW FIRM PLC, Memphis, Tennessee, for John Falls. John W. Christopher, CHRISTOPHER LAW OFFICE, PLLC, Jackson, Mississippi, Charles E. Waldman, Memphis, Tennessee, for Tattooed Millionaire Entertainment and Christopher C. Brown.

-------------------

**OPINION**

-------------------

JULIA SMITH GIBBONS, Circuit Judge.  This appeal concerns the allocation among different parties of an insurance payout resulting from a 2018 trial in the Western District of Tennessee.  In that first case, the jury verdict included a $2.5 million award to John Falls, a Memphis musician and music businessman, under an insurance policy issued by Hanover American Insurance Company.  Hanover moved under Rule 50(b) to set aside the verdict, and the district court granted its motion.  On appeal, this court reversed and ordered the district court to reinstate the jury verdict.  We held in that case that because Hanover had failed to make an initial 50(a) motion, it was therefore barred from making its Rule 50(b) motion.

The $2.5 million payout then became the subject of an interpleader action (and a parallel state action between two of the three parties in this appeal).  The district court initially enjoined the state action, but this court reversed.  Then, the district court, on summary judgment, held that, applying principles of res judicata, the first trial and decision by this court precluded Hanover from making certain arguments against Falls as to the distribution of funds.  After a bench trial, the district court found facts as to the value of the interests at stake and divided the funds, with the majority going to John Falls and the remainder to Christopher C. Brown, who owned the equipment insured by the policy.  Hanover and Tattooed Millionaire Entertainment appeal.

We affirm the district court's decision.  First, Hanover may not challenge Falls's recovery, directly or indirectly, based on grounds and arguments it could have brought in the first case.  Although the district court erred by interpreting the wrong lease for the purposes of its later analysis, we find this error harmless, because in the circumstances of this case it was correct to allocate the funds based on the value of the leasehold.  Finally, the district court's determination of the value of the leasehold and its resulting allocation was not clearly erroneous.  We affirm the district court's judgment.

*Hanover Am. Ins. Co. v. Tattooed*
                                    *Millionaire Ent. et al.*

# I.

## A.

In 2014, musician and producer Christopher C. Brown, through his company Tattooed
Millionaire Entertainment (TME), bought the House of Blues music studio in Memphis,
Tennessee. *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 771 (6th Cir.
2020) ("*Hanover I*"). Brown, through TME, also purchased an insurance policy on the studio
and the music equipment it contained from Hanover American Insurance Company. *Id.* Brown
insured the studio premises for $4.65 million, the music instruments and recording studio
equipment inside for $5.5 million, and the studio's business income for $600,000. *Id.* The
instruments and equipment were termed Business Personal Property ("BPP"). *Id.*[1] The House of
Blues building contained three studios: Studios A, B, and C. *Id.* Brown operated Studio A,
leased Studio B to John Falls, and leased Studio C to Daniel Mott. *Id.* at 771–72. Brown and
Falls, the lead singer of the band Egypt Central, had once been "cordial rivals," but by 2014 built
a strong working relationship around launching a record label and producing music. *Id.* at 771.
Falls separately leased Studio B for his own independent music production operations. *Id.* Falls
also obtained insurance from Hanover for the specific BPP in Studio B and for lost business
income. *Id.*[2]

Falls's lease agreements with Brown and the BPP insurance policy he obtained from
Hanover for the Studio B equipment are central to this case. Falls leased the studio space for
$500 a month, with automatic renewals, and the equipment for $1000 a month, with an option to
renew. *Id.*[3] Falls's policy from Hanover had a limit of $2.5 million for the BPP in Studio B and
$500,000 for business income. *Id.*

---

[1]We use the terms "BPP" and "gear" interchangeably.

[2]To be clear, this BPP was insured both by Brown (through his own policy) and by Falls (through the
policy at stake in this case). This fact is relevant to our determination that the district court did not err in its
allocation. *See infra* Section III.C.2.

[3]Falls and Brown had created an arrangement that was highly advantageous to Falls, who was paying a far-
below-market rate to lease high-end recording equipment owned by Brown; he had an automatically renewing lease
to the Studio B space in which the equipment was housed, and he had the option to renew the equipment lease at
terms to be agreed. The insurance on the BPP in studio B was a policy protecting the parties' respective interests,

In 2015, the studio suffered a break-in and a fire determined to be arson; the building was damaged, and a great deal of the equipment was damaged or stolen. *Id.* at 772. Together, Brown, Mott, and Falls compiled their insurance claims into one document with the help of a public adjustor, but separately signed proofs of loss, with each claiming losses up to their policy limit—eventually totaling $10.5 million in BPP alone. *Id.* Hanover made an advance payment of around $2.7 million: Falls and Mott each received $250,000, and Brown received the remaining $2.2 million. *Id.* But problems soon arose. Hanover discovered that Brown had forged the receipts detailing his underlying purchases of the lost equipment. *Id.* at 773. And Brown had recently suffered two other suspicious insurance losses, including a "remarkably similar loss to arson" in the previous calendar year. *Id.* Hanover sued, seeking recovery of its advance payments and a declaratory judgment that it did not owe any remaining payments to either Brown, TME, or Mott. *Id.* Brown, Falls, and Mott counter-sued, seeking the remainder of their claims under breach of contract. *Id.*

The five-day trial in the Western District of Tennessee involved testimony from Brown and Falls, among others. *Id.* Brown's testimony gave an impression of untrustworthiness, even beyond the forgery of the receipts, to which he admitted. *Id.* In the words of the court in *Hanover I*, the falsifying of the receipts constituted "forgery . . . on a grand scale," because "the receipts were not just recreations of lost originals, but forged representations of transactions that had never occurred." *Id.* Falls, on the other hand, appeared more credible: he demonstrated "a detailed grasp of the production business that indicated both that there were legitimate reasons for him to have control of Studio B and that he had in fact been hard and productively at work there until the fire." *Id.* Although Falls lacked documentation to substantiate his claims, an independent appraiser testified to the "high professional quality of the studio" and assisted Falls in preparing valuations for the insurance claim. *Id.* at 774. The jury also heard testimony that Falls had not been involved in the initial purchase of the equipment and that Falls had played no part in Brown's forgery. *Id.*

---

with Falls's advantageous leasehold protected and Brown/TME listed as a loss payee due to be paid "jointly" in the event of a loss "as interests may appear." DE 153, Pretrial Order, Page ID 4317–18.

The verdict form was structured so that each question that the jury answered would cover claims between Hanover and only one of the three insured parties. *Id.* Answering the nineteen questions divided among the three parties, the jury found the following facts:

- No defendant had made a material misrepresentation in his initial application for insurance when describing and valuing the studio and equipment; material misrepresentations and unlawful insurance acts were made only as to the value of the equipment lost in the fire.

- Brown and TME were indistinguishable; TME's actions could be attributed to Brown.[4]

- Brown had made material misrepresentations after the fire with intent to deceive Hanover as to the amount of loss suffered in the fire and had "committed an unlawful insurance act" in making his claim.[5]

- Falls, however, had not committed material misrepresentations with intent to deceive, nor any unlawful insurance acts.

- Hanover owed $2.5 million in BPP coverage and $250,000 in business income coverage to Falls.

*Id.*; *see also* No. 2:16-CV-02817, DE 312, Verdict Form, Page ID 7688–91 (W.D. Tenn. Nov. 20, 2018).

After the verdict, Hanover filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), arguing for the reversal of the verdict as to Falls. Crucially, although the motion was styled as a "renewed" motion for judgment as a matter of law, Hanover had never actually made an initial Rule 50(a) motion for judgment as a matter of law against Falls before the case was submitted to the jury. *Hanover I*, 974 F.3d at 782–83. The district court granted the motion nonetheless. Falls, Brown, and TME appealed.

## B.

The *Hanover I* opinion focused on the propriety of this grant of Hanover's 50(b) motion by the district court. This court determined that Hanover forfeited its Rule 50(b) motion by not

---

[4]Based on this conclusion, this opinion refers to "Brown/TME," following the district court's lead.

[5]Brown has since pled guilty to a federal mail fraud charge connected to his insurance claims against the Hanover policy. *See* No. 2:20-CR-20245, DE 2; 63; 96 (W.D. Tenn. Sept. 20, 2023 and Oct. 17, 2024). Docket numbers are indicated for materials from dockets other than the case on appeal. A DE citation without a docket number refers to the case on appeal, W.D. Tenn. docket number 2:20-cv-02834.

making a 50(a) motion as to Falls.[6]  *Id.* at 779–90.  Accordingly, the court did not consider the merits of Hanover's Rule 50(b) motion and remanded with instructions for the district court to reinstate the jury verdict as to Falls.  *Id.* at 790–91. This court's reasoning flowed from the relationship between Rule 50(a) and Rule 50(b).  The necessity of a Rule 50(a) pre-verdict motion before a Rule 50(b) post-verdict motion is based on basic concepts of notice and fairness: the Rule 50(a) motion raises arguments to the court and opposing parties before a case goes to the jury, and so it follows that a party may not wait to see how the jury decides something before seeking relief. *See id.* at 780–81.

The court briefly analyzed alternative grounds for potentially affirming the district court, rejected them, and went on to make comments about the future course of litigation in the case. This appeal focuses on the scope and potential preclusive effect of this portion of the *Hanover I* opinion.  The parties aim portions of their preclusion arguments at almost every sentence in this final section of *Hanover I*.  For clarity, we reproduce it here:

### C.  Tennessee Public Policy

The jury awarded Falls $2,500,000 as the amount of insurance he was owed, up to his policy limit, for Business Personal Property coverage and $250,000 as the balance of the Business Income insurance he was owed.  (Along with the $250,000 he was already advanced and under the verdict would not have to pay back, this amount brought the BI payout up to his policy maximum of $500,000.) The BPP payment covers the loss of the gear in Falls's studio.  However, Brown is the ultimate owner of the lost gear, on which Falls had a perpetually renewable leasehold.

Therefore, Hanover argues, payment of the $2,500,000 would violate public policy, because Brown would ultimately benefit from his own wrongdoing.  It is an "ancient equity maxim that no one should benefit from his own wrongdoing." *K&T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 178 (6th Cir. 1996).  The Supreme Court of Tennessee recognized the application of this principle in insurance cases in *Box v. Lanier*, 112 Tenn. 393, 79 S.W. 1042, 1045 (1904). "No one shall be permitted to profit by his own fraud, or to take advantage of his

---

[6]In *Hanover I*, we recognized that the trial judge had made ambiguous comments conceivably inviting the parties to forgo filing Rule 50(a) motions.  *Hanover I*, 974 F.3d at 781–83.  But we also noted that these comments did not deter Hanover from making an explicit Rule 50(a) motion with respect to Brown.  *Id.* at 784.  So, the 50(b) motion as to Falls was deemed forfeited.

own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Ibid.*

The public-policy argument, however, even if accepted, does not mean that Falls takes nothing of the $2,500,000 BPP award. Falls had a property interest in the "gear," in the form of his leasehold with unlimited renewal options.[7] Leaseholds have been held to be insurable interests. More to the point, Hanover clearly accepted at trial that Falls had at least an arguable property interest: Barkman testified at trial that the payment for BPP under the Falls policy would go to Falls and Brown jointly. Thus, Barkman said, it would have to be endorsed by Brown to be cashed by Falls. As Falls's counsel explained to us at oral argument, the proceeds will become the subject of an interpleader action between Falls, Brown, Hanover, and Brown's other creditors.

This was the district court's plan for how to handle the issue: Falls and TME would "sue each other" in the event of a win, but not fight it out during the main trial. Though Falls and Hanover both make interesting legal arguments as to the disposition of the funds, we see no reason to short-circuit that plan. Such arguments can be made in whatever subsequent proceedings arise over this payment.

## CONCLUSION

For the foregoing reasons, we DENY Hanover's motion to dismiss these appeals and AFFIRM the judgments of the court below as to Brown/TME, Nos. 19-5550 & 19-5551, and Mott, 19-5562. But we REVERSE as to Falls, No. 19-5483, and REMAND with instructions to reinstate the jury verdict on the grounds that Hanover had forfeited its Rule 50(b) motion by not bringing a Rule 50(a) motion.

*Id.* at 790–91.

Proceedings then diverged. Falls sued Brown and TME in Tennessee state court (without adding Hanover as a party), and Hanover filed this interpleader action and sought an injunction against the state-court proceeding in the federal district court. *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 38 F.4th 501, 503 (6th Cir. 2022). The district court initially enjoined the state court proceedings, but this court then reversed that decision, holding that the exception to the federal Anti-Injunction Act covering injunctions necessary to protect the district court's jurisdiction did not apply. *Id.* at 508–12.

---

[7]*Hanover I* footnote 15: "As Falls stated at trial: '[T]here's the unresolved matter of the fact that I had a lease for equipment and a space. That equipment had monetary value to me that I have been out now for three years.' *Cf. State of Tenn. ex rel. Dept. of Trans. v. Gee*, 565 S.W.2d 498, 501–02 (Tenn. Ct. App. 1977) (discussing, in the context of a takings case, the proper calculation of the property value of a leasehold)."

The state court proceedings resulted in an allocation of the payout between Falls and TME. Hanover argued that this state court decision does not bind it because it was not a party to the state court case, and the district court agreed with that argument. Falls does not appeal this portion of the district court's decision.

## C.

After this court reversed the injunction, proceedings continued in the district court. The district court had initially denied Falls's motion to dismiss Hanover's arguments against Falls as precluded by *Hanover I* and allowed Hanover to brief its arguments against Falls. But then on summary judgment, the district court changed course, held that Hanover was precluded from arguing against Falls' recovery and granted summary judgment to Falls on his claims against Hanover. The district court then held a one-day bench trial. The court heard testimony from Brown, Falls, Nathan Evers (a Hanover representative), Pete Matthews (an audio engineer who testified to the rental value of Studio B and its recording equipment), and Robert Vance (an accounting expert who testified to the value of Falls's leasehold interest). The district court accepted Vance's valuation, awarded $2,066,217.30 to Falls, and held that Brown was barred by Tennessee public policy from receiving or crediting the remaining $433,782.70 of the $2.5 million he would otherwise be due. Hanover then appealed, and Brown cross-appealed.

## II.

Reviewing a case on appeal from a bench trial, we review the district court's legal conclusions de novo and its factual determinations for clear error. *Fox v. Washington*, 949 F.3d 270, 276 (6th Cir. 2020). A factual finding is clearly erroneous if "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Osborn v. Griffin*, 865 F.3d 417, 436 (6th Cir. 2017) (citation modified). And a level of deference on factual questions is proper: "if 'the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Id.* (citation modified).

## III.

The district court was correct to hold that Hanover was precluded from contesting the amount of its payment to Falls.  Nevertheless, Brown adopts Hanover's arguments.  Brown is permitted to make arguments regarding the construction of the policy, and so we analyze those arguments.  On the merits, however, those arguments do not require the district court's order to be vacated or reversed.  Under Tennessee law, the fact that TME is listed as a "loss payee" in the policy means only that the value of Brown/TME's ownership interest in the BPP (subject to the leasehold) ought to be satisfied by the payout proceeds as well as the leasehold interest, not that Brown/TME gets the entire payout.  So the disposition of the case still depends on the legal question of the parties' obligations after the fire and the factual question of the values of the underlying interests.

The district court's decision determined that the lease had not terminated.  The district court then valued the leasehold based on the trial testimony, and allocated the funds based on that valuation.  Although the district court relied on the lease for the Studio B space rather than the lease for the recording equipment at issue in this case, we hold that its error was harmless.  Under Tennessee law, when parties arrange for insurance coverage within a lease, a loss covered by that insurance does not necessarily terminate the lease; instead, the parties' rights and obligations under the lease as expressed in the language of the instrument inform the allocation of the insurance funds.  Under the circumstances of the lease and strong working relationship seen in this case, the intent of the parties was to insure both Falls's valuable leasehold and Brown's ownership interest subject to that potentially renewing leasehold.  So the district court was correct to allocate the funds based on the value of the respective interests at stake.  And the values it reached were not clear error.  Finally, Tennessee public policy prevents Brown from recovering his allocated funds, because he admitted to misrepresenting the value of the BPP under the policy.

### A.

The judgment of a federal court sitting in diversity is given the same preclusive effect in a later federal proceeding that it would be given in the state courts of the state in which the first

federal court sits. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). Thus, the district court was correct to apply the Tennessee law of claim preclusion, alternatively termed res judicata, to the federal judgment in *Hanover I*.

The doctrine of claim preclusion promotes finality in litigation and operates to bar "a second suit between the same parties or their privies on the same claim with respect to all issues which were, or could have been, litigated in the former suit." *Elvis Presley Enters., Inc. v. City of Memphis*, 620 S.W.3d 318, 323–24 (Tenn. 2021) (citation omitted). The party asserting the defense of claim preclusion must show:

> (1) that the underlying judgment was rendered by a court of competent jurisdiction, (2) that the same parties or their privies were involved in both suits, (3) that the same claim or cause of action was asserted in both suits, and (4) that the underlying judgment was final and on the merits.

*Id.* at 324 (citation omitted). The Western District of Tennessee had jurisdiction over *Hanover I*. Hanover, Falls, Brown, and TME were parties to both cases. But the third and fourth elements are closer calls. The third element asks whether Hanover's arguments about the proper interpretation of the insurance agreement and the application of Tennessee public policy principles were made, or could have been made, in *Hanover I*, and the fourth asks whether that case was a final decision. We address these together. Falls argues that "[i]n defending Falls's counterclaim [in *Hanover I*], Hanover was obligated on pain of res judicata/claim preclusion to raise *all* arguments as to why Falls would have been precluded from recovery of the BPP or restricted to a lower amount." CA6 R. 29, Falls Br., at 21.

The argument Hanover makes in this case was also made in its forfeited 50(b) motion. Hanover argued that because TME/Brown was the sole owner and included as loss payee for the BPP insured under Falls's policy, "every penny of the $2,500,000 BPP award will be payable to TME/Brown, the confessed ringleader of the fraudulent scheme," which Tennessee public policy does not permit. No. 2:16-CV-02817, DE 319-1, Hanover's 50(b) Mot., Page ID 8769 (W.D. Tenn. Dec. 17, 2018). Meanwhile, in its brief on this appeal, Hanover argues that "Falls is not entitled to any portion of the BPP insurance proceeds because Brown/TME own all of the insured gear and the Falls insurance policy identifies TME as the sole loss payee for "ALL

INSURED BPP."  CA6 R. 24, Hanover Opening Br., at 24.  This case begins to taste like a second bite at the apple.

Not so fast, Hanover says.  As Hanover sees it, our decision in *Hanover I* "specifically preserved the allocation issue" for a future interpleader case—therefore, the claim was either not fully decided or was expressly preserved.  *Id.* at 7 (emphasis omitted).  There is some attraction to this contention at first consideration.  A judgment must be final for claim preclusion to apply, and a decision that leaves a certain issue open for future adjudication is not accorded preclusive effect as to that issue.  *See* Restatement (Second) of Judgments, § 13(a) (calling this a "common sense" principle).  The *Hanover I* decision specifically states that Hanover's "interesting legal arguments as to the dispositions of the" insurance proceeds "can be made in whatever subsequent proceedings arise over" the payment at issue here.  974 F.3d at 791.

*Hanover I* was primarily concerned with holding Hanover's Rule 50(b) motion precluded and reinstating the jury verdict that ordered the payment to Falls.  The problem, however, lies in determining which "arguments," and against whom, the *Hanover I* court meant when it said this.  The best reading of the *Hanover I* opinion is that, while Hanover can advance its public policy arguments against Brown, Hanover is barred by the reinstated verdict in *Hanover I* and by its litigating positions in that case from contesting its obligation to pay Falls or the amount of the payment to Falls.  In short, this court preserved Hanover's public policy arguments against Brown, but not its arguments against Falls.

This conclusion is a necessary consequence of the way *Hanover I* was structured and submitted to the jury: each party's liability was tied to its own alleged insurance misrepresentations.  The jury was tasked with assessing Falls's counterclaim for breach of contract and was not asked to decide whether any acts at all by Brown/TME could prevent recovery under the Falls policy.

This principle of separability was significant throughout the *Hanover I* opinion in this court.  The *Hanover I* opinion titles the section at issue "Tennessee Public Policy."  *Id.* at 790.  Hanover's "public policy" argument was that because (1) general Tennessee principles of equity prevent any party from profiting from its own fraud, (2) Brown had been found by the jury to

have committed wrongful insurance acts, and (3) the policy's terms meant that Brown as owner would get all, or at the very least some of the funds; therefore Hanover ought not to have to make the payout at all. In short, because Brown—the ultimate owner of the lost BPP and the putative sole payee under the policy—had been found by the jury to have committed wrongful insurance acts, Hanover owed no money at all on this policy despite the verdict. *Id.*

The *Hanover I* opinion looked askance at this argument. "The public-policy argument, however, even if accepted, does not mean that Falls takes nothing of the $2,500,000 BPP award. Falls had a property interest in the 'gear,' in the form of his leasehold with unlimited renewal options." *Id.* This language shows that the *Hanover I* court viewed the argument as potentially attacking or conflicting with the verdict and *Hanover I* judgment—if Falls had no insurable interest, how could he recover under the policy, as the jury found he should?

Further, the court in *Hanover I* disapproved of Hanover's "sandbagging" in an effort to avoid paying Falls. The opinion faulted Hanover for seeking to change course after it had allowed the case to be submitted to the jury under a theory of separate liability, under which Brown's misbehavior was adjudicated separately from Falls's entitlement to recovery. Hanover could have requested jury instructions on the effect of Brown's actions on Falls's policy, or otherwise "could have requested that the verdict form be structured so as to tie the issues together," but had not done so. *Id.* at 788. "Thus, all parties sent the case to the jury with each party's *own* misrepresentations isolated from the others and tied to its own individual liability." *Id.* (emphasis in original); *see* No. 2:16-CV-02817, DE 312, Verdict Form, Page ID 7688–91 (W.D. Tenn. Nov. 20, 2018). But then, after the jury had found misconduct by Brown and not by Falls, Hanover "turned around and argued the opposite" to try to avoid paying Falls based on Brown's fraud. *Id.*; *see also id.* at 784 ("the case went to the jury on a theory that was very nearly the opposite of that on which Hanover prevailed after trial" by means of its 50(b) motion). We stated that "behavior of this sort, sometimes called 'lying in the weeds' or 'sandbagging,' should be strongly discouraged." *Id.*

To be fair to Hanover, this specific quoted "sandbagging" language probably applied to a very similar but distinct argument on which Hanover had prevailed by 50(b) motion.[8]  But the fact remains that if Tennessee public policy barred any payout under the Falls policy because of Brown's acts (as Hanover argues here) the verdict form could not have been structured the way it was, with only Falls's potential misrepresentations capable of barring his recovery.  This court held Hanover's 50(b) motion to be forfeited.  Such forfeiture would have little meaning if Hanover could lie in the weeds even longer and then mount arguments against Falls on grounds available in *Hanover I*.  In this way, the arguments Hanover now seeks to make *against Falls* ought to have been made as part of the *Hanover I* action before the case went to the jury.  Hanover argues in its reply brief that it "did try to address allocation of the BPP funds in *Hanover I*."  CA6 R. 30, Hanover Reply Br., at 1.  But it does not get credit for having done so in the Rule 50(b) motion that this court held was forfeited.

In sum, this court in *Hanover I* preserved a "public-policy argument," but it also upheld and reinstated a verdict that (1) found no wrongdoing on the part of Falls and (2) awarded him funds based on a principle of separability.  *See Hanover I*, 974 F.3d at 788, 790.  The district court in the current case reconciled those two actions by holding that Hanover could still argue *against Brown* that public policy barred recovery of whatever portion of the payout *Brown* was owed, but that Hanover could not get a new chance to litigate allocation against Falls.  This was correct.

Res judicata does not bar consideration of these contractual issues as raised by Brown, who had no incentive in *Hanover I* to attack his co-defendant's interest (and whose ability to pursue these arguments was more clearly anticipated both by the amended judgment in the district court and the *Hanover I* opinion's endorsement of the "sue each other" plan).  *Hanover I*, 974 F.3d at 791; *cf. United States v. Berman*, 884 F.2d 916, 923 n.9 (6th Cir. 1989).  Next, we

---

[8]This would have been the argument that Brown's fraud directly voided Falls's policy by the terms of its plain language, which even Hanover admits was decided in *Hanover I* (Hanover suggests in arguing against preclusion that the district court thought Hanover was asserting this argument again).  The fact that this concededly precluded argument mirrors the operation and structure of the argument Hanover seeks to make today (i.e., Brown's bad acts block recovery by Falls under the language of Falls's policy) is further support for our holding that there is no reason this argument could not have been raised in litigating *Hanover I*.

*Hanover Am. Ins. Co. v. Tattooed*
*Millionaire Ent. et al.*

consider Hanover's contractual arguments as raised by Brown, who incorporates them by reference.[9]  Brown's brief agrees with Hanover on all contract issues, and only differs in arguing that Tennessee public policy does not actually bar Brown from benefiting from the allocated funds.  We address those arguments below.  *See infra* Section III.F.

## B.

Hanover's first merits argument is that clauses in the Falls policy naming TME as the "loss payee" are best interpreted such that any insurance payment under the policy simply goes to TME.  CA6 R. 24, Hanover's Opening Br. at 24–34; CA6 R. 27, Brown/TME Br. at 11 (incorporating Hanover's arguments by reference).

The parties disagree about the character of the ownership and leasehold interests in the BPP, but they stipulated to the existence and relevance of certain contractual terms in the policy. They agree that "Brown/TME is the sole owner of the gear insured by the Falls policy subject to the leasehold interest held by Falls."  DE 153, Pretrial Order, Page ID 4317.  They also agree that the lease for the BPP "required Falls to insure the gear for 'at least $2,500,000.'"  *Id.* at Page ID 4318.  They agree that TME is listed as a "Loss Payable" for "ALL INSURED BPP."  *Id.*  And they agree that additional "Loss Payable Provisions" are part of the policy and provide that "For Covered Property in which both you and a Loss Payee . . . have an insurable interest, [Hanover] will: a. Adjust losses with you; and b. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear."  *Id.*  Finally, they agree that Falls has not paid rent to Brown or TME under the lease for the studio or the lease for the BPP since the fire.  *Id.*

From there, they diverge.  Brown incorporates Hanover's arguments that a "loss payable" clause requires that a named loss payee take priority over the claim of a named insured.  Hanover makes this argument by citing *Union Planters National Bank v. American Home Assurance Co.*, No. W2001-021124-COA-R3-C, 2002 WL 1308344 (Tenn. Ct. App. Mar. 18, 2002).  Falls disagrees, pointing out that the stipulated Loss Payable Provisions specifically provide that claims under the policy would be paid "jointly to you and the Loss Payee, as interests may

---

[9]For convenience and clarity, however, we still refer to them as Hanover's arguments, as we are responding to arguments in Hanover's briefing.

appear" and distinguishing *Union Planters*.[10]  CA6 R. 29, Falls Br., at 28–32 (emphasis omitted).
Finally, Falls argues, even if the loss payable clause does give priority, it only does so up to the
extent of the interest itself.

Although the loss payable clause does protect TME/Brown's ownership interest, Falls is
correct that any protection only goes to the extent of the interest itself, so the argument does not
make the difference Hanover thinks it does.  *Union Planters* states that "[g]enerally, a 'loss-
payable' clause provides that proceeds of an insurance policy are to be paid first to the
designated loss payee rather than to the named insured."  2002 WL 1308344, at *4.  Loss
payable clauses most typically appear at the intersection of a mortgage and an insurance policy,
where, for example, a bank as mortgagee owns an interest in an insured piece of property and is
listed as a loss payee so that its "interest in property is protected should a loss occur."  *Reeves v.
Granite State Ins. Co.*, 36 S.W.3d 58, 60 (Tenn. 2001).

But this amount need not be the entire value of the insurance policy.  A loss payee's
interest in proceeds is protected no more or less than the loss payee's interest in the insured
property.  If, in the mortgage context, the underlying note is partially satisfied (as in, for
example, when the mortgagor has paid off a portion of the debt), the mortgagee designated as
loss payee only recovers the remaining portion of their interest—where the debt is fully paid, this
may be none.  *See Benton Banking Co. v. Tenn. Farmers Mut. Ins. Co.*, 906 S.W.2d 436, 438,
440 (Tenn. 1995) (mortgagee "entitled to insurance proceeds to the extent of the mortgage
debt"); *Hocking v. Va. Fire & Marine Ins. Co.*, 42 S.W. 451, 451 (Tenn. 1897) (a mortgagee
"made payable as his interest may appear is, in a large sense, an assignee *to the extent of his
interest*" (emphasis added) (citation omitted)).

So, some division of proceeds between the two parties is consistent with the joint loss
payee language in the Hanover policy, where both parties had insurable interests covered by the
policy.  To be sure, *Union Planters* could possibly be read to require Brown's interest to be

---

[10]Falls also argues that because Brown, not TME, owned the BPP at stake, TME as loss payee had no
insurable interest and may not recover as a matter of law.  This argument would carry more weight if the parties had
not stipulated that "Brown/TME is the sole owner of the gear" and if the jury had not found that TME and Brown
were "indistinguishable such that Tattooed Millionaire Entertainment, LLC, may be disregarded."  No. 2:16-CV-
02817, DE 312, Verdict Form, Page ID 7689 (W.D. Tenn. Nov. 20, 2018); DE 153, Pretrial Order, Page ID 4317.

valued and satisfied first, with Falls getting the remainder (the reverse of what happened here, where Falls's interest was valued first and compensated in full).

But we hold that *Union Planters* does not control priority here.  It is not clear that Brown's interest is required to be paid by the insurer first in a situation like this one, where (1) the payment is to be made "jointly" and (2) the underlying relationship between the parties is one of lessor and lessee, rather than mortgagor and mortgagee.  We have not found a Tennessee case applying similar language to give such strict priority in the joint payee, lessor-lessee context.  *Cf. Charter Oak Fire Ins. Co. v. Lexington Ins. Co.*, No. M2002-01752-COA-R3-CV, 2004 WL 431488, at *1–2, *6 (Tenn. Ct. App. Mar. 2, 2004) (lessees purchased fire insurance as required in lease; lessor named as "loss payee or additional insured"; insurance company paid funds to lessors, after subtracting funds paid first to lessee "for loss of personal property" in the fire based on lease language).[11]  And some cases from other jurisdictions, confronting situations where lessors and lessees are both to be paid, do not give either party priority and simply carry out a division of the proceeds according to the nature and value of the underlying interests.  *See, e.g.*, *Grand Forks Seed Co. v. Northland Greyhound Lines, Inc.*, 168 F. Supp. 882, 884 (D.N.D. 1959); *Osborn v. Home Ins. Co.*, 914 S.W.2d 35, 38 (Mo. Ct. App. 1996); *cf. Hartsell v. Integon Indem. Corp.*, 493 S.E.2d 740 (N.C. 1997).

When property is condemned in eminent domain, Tennessee cases explicitly approve valuing the leasehold first and giving the remainder of the condemned value to the lessor.  *State v. Gee*, 565 S.W.2d 498, 502 (Tenn. Ct. App. 1977) (in the eminent domain context, rejecting lessor-first calculation as a matter of law).  *Osborn* uses the eminent domain methodology in an insurance payout division context.  914 S.W. 2d at 38.  And Hanover does not challenge Falls's citation to eminent domain cases on appeal.

---

[11]In *Hayes v. Ferguson*, the Tennessee Supreme Court held that, where lessees had refused to use an insurance payout to replace premises, the lessor was entitled to the money because lessee's "interest in it and right to it ceased."  1885 WL 2862, at *12–13 (Tenn. 1885).  The *Hayes* opinion declined to distribute insurance funds based on the language of a loss payee clause that named the lessees.  Rather, the lessees' obligation to replace buildings at their own expense in the event of fire meant that the funds, even if initially paid to them, were only to be used for that purpose.  The insurance policies in *Hayes* insured the interests of the lessors, "not the leasehold interest" of the lessees.  *Id.* at *10.  In this case, by contrast, Hanover concedes that the *Hanover I* jury found that Falls had an insurable interest in the BPP at stake here.  We examine Tennessee law in construing the lease and its obligations below.  *See infra* Section III.C.2.

Although Hanover points to testimony from its corporate representative, Nathan Evers, who testified at the bench trial in this case that the policy requires Hanover to pay TME only, testimony as to how Hanover would interpret its own policy—which lines up well with its current litigating position—does not control the application of law to loss payee provisions. *See Union Planters*, 2002 WL 1308344, at *4 ("The interpretation of the policy . . . is a matter of law, not of fact.").

We hold that the district court was correct to treat the joint loss payable clause as allowing a division of proceeds between Brown as lessor and Falls as lessee based simply on the value of those two interests. So this question is ultimately the same as the question of how to divide the proceeds between the two parties. And that, in turn, is governed by the terms of the lease agreement between TME and Falls.

## C.

### 1.

We next consider the leases. Hanover argues that Falls cannot recover as the district court allowed him to because his lease terminated at one of three possible times: before the fire, because (Hanover alleges) Falls failed to pay rent; at the time of the fire, because (Hanover claims) a fire terminates a leasehold interest; or in 2017, at the time the lease contemplated termination absent renewal. Hanover argues that it should, at most, only be liable to Falls for payments reflecting the leasehold's value through 2017.[12]

The district court found that the lease never terminated because (1) the record showed that Falls was current on lease payments before the fire; and (2) the lease did not require a written notice to exercise the option to renew, which meant that the lease "extend[ed] automatically unless a notice of termination was provided." DE 164, District Ct. Op., Page ID 4594, 4596. The first determination is not clear error where, as here, the trial testimonies of Falls

---

[12]Hanover further proposes reducing this figure by the amount of the lost business profits payout Falls has already received. This suggestion is not well taken. This appeal concerns the payout for an interest in the BPP, not the payout for lost profits. Hanover does not argue that as a matter of law Falls cannot recover both; it just argues that the result Falls seeks is absurd.

and Brown as to whether Falls' payments were current contradicted each other, and Falls's was clearer and more definite.[13] But the latter determination was error. In determining that the lease extended automatically, the district court referred to the *retail* lease for the Studio B *space* instead of the lease for the Studio B *equipment* at issue in this case. The retail lease provides for automatic renewal; the equipment lease only provides that Falls had an *option* to renew, on terms to which the parties would agree at the time of renewal.

Although both parties discuss whether the lease terminated and cite Tennessee cases involving the lease and insurance context, they focus their arguments on termination, rather than how the intent of the parties as expressed in the lease should be interpreted to allocate responsibility for repair and the resulting distribution of the insurance funds. We do not typically answer such questions of intent in the first instance. But in the interest of judicial economy, we do so today. *Cf. Kerr v. Comm'r of Soc. Sec.*, 874 F.3d 926, 933 (6th Cir. 2017).

2.

Under Tennessee law, the owner of insured leased property does not always receive the entire proceeds of any insurance policy when the property is destroyed by fire. Instead, the cases contemplate that where the parties have contracted for one party's purchase of insurance, and allocated the cost and responsibility of repair, the choices made and expressed in their agreement control the distribution of insurance proceeds. The question is how this principle is to be applied today, ten years later, where the studio has not been rebuilt? We hold that the proceeds may be divided as the district court undertook to do.

Tennessee cases regarding the disposition of fire insurance proceeds in a lessor-lessee context hinge on the intent of the parties regarding repairs or replacement after fire loss, as expressed in the lease terms or inferred from them. *See First Am. Nat. Bank v. Chicken Sys. of Am., Inc.*, 510 S.W.2d 906, 908 (Tenn. 1974) ("[T]he cardinal rule of construction" of written instruments is "that the intention of the parties as ascertained from the language of the instrument controls."); *St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.*, 725 S.W.2d 948, 951 (Tenn.

---

[13]*See, e.g.*, DE 156, Trial Tr., Page ID 4386–88 (cross-examination of Brown) ("Q: Did you have a ledger where you kept a ledger of Mr. Falls's rent payments? A: We're musicians, and that was never a thing.").

Ct. App. 1986); *Charter Oak*, 2004 WL 431488, at *5; *Hall v. Park Grill, LLC*, No. E2020-00993-COA-R3-CV, 2021 WL 2135952, at *2, *6 (Tenn. Ct. App. 2021). Specifically, where the parties have contracted to require insurance, and include in the lease clauses that contemplate potential repair or replacement of insured property, the structure of the lease relationship survives in some form following loss by fire and these clauses control the distribution of the insurance funds, which are typically understood to be used to replace the lost or damaged property. *See EVCO Corp v. Ross*, 528 S.W.2d 20, 24 (Tenn. 1975) ("[W]e do not believe it was the intention of the parties that there should be an automatic cancellation or termination" where promises regarding repair and replacement were included in the lease in question); *Taylor v. White Stores, Inc.*, 707 S.W.2d 514, 516–17 (Tenn. Ct. App. 1985) (concluding that lease did not terminate based on the "clear import" of the lease agreement).

The intent of the parties controls even where the language of the lease does not necessarily require that the funds be used for replacement, and even where this means the lessor does not completely recover for its leased and destroyed property. In *Hall v. Park Grill, LLC*, the lessor had leased a building to Park Grill, "a company that had utilized the building primarily as a storage facility for its restaurants" in Gatlinburg, Tennessee. No. E2020-00993-COA-R3-CV, 2021 WL 2135952, at *1 (Tenn. Ct. App. May 26, 2021). The building was destroyed in the Gatlinburg wildfires of 2016, and an insurance company paid the lessee, Park Grill, who had insured the premises, around $130,000. *Id.* In 2019, the plaintiff, Faye Hall, representative of the original lessor's estate, sued based on the lease, seeking the value of the leased building or the amount of the fire insurance proceeds. *Id.* at *2. Where Hall had argued that the lease's clear import required fire insurance proceeds to be put toward replacing the building, the Court of Appeals of Tennessee interpreted the lease differently, and held that the parties had expressly agreed that the funds would only be used for replacing the building "[i]n the event these premises are damaged by fire or other insurable loss, and the premises can be reasonably repaired within ten (10) working days." *Id.* at *2, *13. Because the premises could not be repaired within that period, the lessor's estate was not entitled to the insurance proceeds. *Id.* at *15.

In *EVCO*, the lessor covenanted to be responsible for "all major repairs" and was required to "carry fire insurance upon the building structure," while the lessee covenanted to

"return the premises back to the lessor at the expiration of the lease." 528 S.W.2d at 21 (citation omitted). The court held that the lessor's promise to carry out major repairs, coupled with the lessor's covenant to carry fire insurance, meant that "the loss in this case must fall upon the lessors" despite the lessee's promise to return. *Id.* at 24. Nonetheless, due to the time spent in litigation and the short time left on the lease, the Tennessee Supreme Court did not instruct lessors to rebuild the premises, as it read the lease to require, and it left the scope of relief for their breach open to Tennessee's Chancery Court on remand. *Id.* at 24–25. In *St. Paul*, the obligation was reversed: the *lessee* expressly covenanted to repair or to replace the premises and promised to keep the premises "insured against loss or damage by fire." 725 S.W.2d at 950. The Tennessee Court of Appeals described the situation as "somewhat analogous . . . in reverse" to *EVCO*, and stated that "obviously the funds from the fire insurance policies were to be used" for the purpose of fulfilling the lessees' promise to replace the building. *Id.* at 952. Where both sides agreed the lease had terminated, and the proceeds had not been so used, the Court of Appeals simply awarded the insurance proceeds in their entirety to the lessors. *Id.*

There are five clauses of Falls' lease that are relevant to our determination of the intent of the parties. First, the equipment lease provides that Brown/TME as lessor "shall maintain, at the Lessor's cost, the equipment in good repair and operating condition, allowing for reasonable wear and tear. Such costs shall include labor, material, parts, and similar items." CA6 R. 25, App., at 00007. We call this the "repair" clause. Second, the lease provides that "[a]t the end of the Lease term, the Lessee shall be obligated to return the equipment to the Lessor at the Lessee's expense." *Id.* We call this the "return" clause. Third, the lease provides that Falls as lessee "assumes all risk of damage to the equipment from any cause, and agrees to return it to the Lessor in the condition received from the Lessor, with the exception of normal wear and tear, unless otherwise provided in this Lease." *Id.* at 00008. We call this the "assumption" clause. Fourth, the lease provides that "[u]nless otherwise provided in this Lease, if the equipment is damaged or lost, the Lessor shall have the option of requiring the Lessee to repair the equipment to a state of good working order, or replace the equipment with like equipment in good repair, which equipment shall become the property of the Lessor and subject to this Lease." *Id.* We call this the "option to replace" clause. Fifth and finally, the lease provides that Falls as lessee "shall

*Hanover Am. Ins. Co. v. Tattooed*
                                    *Millionaire Ent. et al.*

insure the equipment in an amount of at least $2,500,000." *Id.* We call this the "insurance"
clause.

A court attempting to interpret a contract must strive to construe "all . . . provisions of a
contract . . . as in harmony with each other, if such construction can be reasonably made, so as to
avoid repugnancy between the several provisions." *Bank of Com. & Tr. Co. v. Nw. Nat'l Life
Ins. Co.*, 26 S.W.2d 135, 138 (Tenn. 1930). But at the same time, the contract terms should not
be given "a strained or unnatural interpretation." *EVCO*, 528 S.W.2d at 23.

Because these clauses involve contrary obligations, it is difficult to harmonize them
completely. By the terms of the lease, the lessor undertakes at his cost to repair and maintain the
equipment,[14] but at the same time the lessee promises to return it at the end of the lease term at
his own expense. The lessee assumes the risk of any damage, but if damage or loss occurs, the
lessor has the option to require the lessee to repair or replace (such replaced equipment becoming
subject to the lease). Finally, the lessee is required to insure.

It seems clear that where a lease expressly requires one party to procure insurance, the
proceeds of that insurance policy are presumed to benefit both parties absent some indication to
the contrary. *See id.* at 23–24. Neither Brown nor Falls separately protected their respective
interests in the equipment "wholly apart from the lease provisions." *Id.*[15] *EVCO* read an
insurance clause as support for its conclusion that lessors were required to bear the cost of
replacement, and left the ultimate disposition of the funds up to another court on remand, as the
lease was nearly up. *Id.*; *see also Tate v. Trialco Scrap, Inc.*, 908 F.2d 974, at *3 (6th Cir. 1990)
(table) (applying Tennessee law and discussing *EVCO* and *St. Paul*)[16]; *Doramus v. Rogers Grp.,*

---

[14]And this language, which mentions "material" and "parts" and distinguishes reasonable wear and tear,
does not necessarily refer only to minor repairs.

[15]Brown had his own separate insurance policy on this BPP. Hanover did not have to pay out under the
policy, as determined in *Hanover I*, because of Brown's unlawful insurance acts.

[16]*Trialco* confronted the distinct question whether, where a lessee *causes* loss to insured property by
negligence, the insurance company can recover from the lessee, or if instead, because required insurance was "for
the benefit" of both lessor and lessee, the negligent lessee was an "implied coinsured" against whom the insurance
company could not recover by subrogation. 908 F.2d 974 at *2–3, *6. In that case, "the burden of the insurance
provision [was] on the lessor while the burden of the repair provision [was] on the lessee." *Id.* at *3 (emphasis

*Inc.*, No. M1998-00918-COA-R3-CV, 2001 WL 196974, at *14 (Tenn. Ct. App. Feb. 28, 2001). It also seems clear, based on this disposition in *EVCO*, and on the Court of Appeals's allocation in *St. Paul*, that where insurance proceeds are to be used to replace insured property under a lease, but time has intervened since the loss in question, a court may allocate them to effectuate this intent and compensate the parties for the interests at stake.

Here, if the lease had not contained TME's general promise to repair and maintain the equipment, the intent of the parties might be to require Falls to obtain insurance for the sole purpose of fulfilling his obligation under the return clause or, alternatively, under the assumption or damage clauses. And then, with the insurance obtained only for that purpose, it would seem proper to allocate the funds either to Falls with the requirement that they be used to replace the equipment, or, following *St. Paul*, entirely to Brown. But that is not the situation before us.

Falls did not obtain insurance for the sole purpose of fulfilling his obligation under the return, assumption, or damage clauses. In fact, the lease includes an unqualified covenant for Brown to maintain and repair the equipment—such an express inclusion is a contractual departure from the default rule that the lessor is not responsible for repairs. *See EVCO*, 528 S.W.2d at 23. Further, Falls's obligation in at least the return clause, and potentially the assumption clause, only applies at the termination of the lease, while Brown/TME's obligation in the repair clause applies continuously. While the option to replace clause could come into operation during the term of the lease, it (1) expressly applies only "[u]nless otherwise provided," (2) does not require replacement absent a request by Brown; and (3) contemplates that the replaced property would become subject to the lease. Because the policy served to protect both parties' interests, including the ability to fulfill Falls's own obligations under the lease, we can reasonably conclude that the policy was obtained for the mutual benefit of both Brown and Falls. In other words, Falls and Brown intended the policy to insure both of their interests under their respective lease obligations.

---

omitted). This court determined that the insurance was for the benefit of both parties, meaning the lessee was a coinsured, which prevented the insurance company from recovering from the lessee.

In sum, the intent of the parties, as far as we can ascertain it, was that, whether Falls could seek repair from Brown under the repair provision, or Brown could seek replacement from Falls under the option to replace provision, the lease would not terminate in the event of damage to the equipment. Instead, the lease would continue in force, with equipment repaired and maintained by Brown or replaced by Falls and still covered by the continuing lease. The lease and insurance arrangement is thus best read as protecting both Falls's valuable leasehold interest and Brown's interest in eventually receiving equipment back at the ultimate termination of the lease, potentially after years of reasonable wear and tear. And because the policy, which was to be paid jointly as interests might appear, protected both parties' interests, the payout could permissibly be allocated between them, as the district court did here.

If, on the other hand, we determined that the clauses could not be reconciled and that the contract was ambiguous, we would look to "extrinsic evidence" to ascertain the intent of the parties at the time of the lease, and our conclusion would be the same. *See Cummings, Inc. v. Dorgan*, 320 S.W.3d 316, 333 (Tenn. Ct. App. 2009). The extrinsic evidence bolsters our conclusion. Brown had his own separate insurance on the BPP. At trial in this case, Brown testified that he expected the proceeds of the Falls policy to be paid to him, "because restoring the studio was definitely the plan, building it back, and putting all the gear back into it"— although, somewhat contradicting this belief, he also testified that he did not understand the lease to oblige him to repair or replace. DE 156, Trial Tr., Page ID 4364, 4366–67. Falls, for his part, testified that all parties expected the studio to reopen, and that the lease required him to return the equipment "whenever" the lease terminated. *Id.* at Page ID 4438, 4443–44. The parties intended their working relationship to extend far into the future, regardless of whether loss intervened. Where the studio was never rebuilt, this state of affairs supports a division today of these proceeds reflecting the interpretation that with this policy, Falls had insured a highly valuable leasehold over many years, subject to a promise eventually to return the used equipment (potentially repaired at Brown's expense) to Brown.

Although the district court relied on the wrong lease and focused on termination to the exclusion of the intent of the parties, we hold that this error was harmless. We agree with its ultimate determination of the question that an allocation of the funds between Falls and Brown

based on a valuation of the leasehold, rather than a complete award to either one or the other, was correct under Tennessee law.

### D.

We turn now to the valuation of the interests at stake. During the bench trial, the court heard testimony as to the value of the leasehold from Pete Matthews, an audio engineer, and Robert Vance, an accounting expert. Vance was the only witness who directly testified as to the value of the leasehold. Matthews testified that similar recording equipment to that in Studio B could be rented out for $8,570 a day in Memphis, and that Falls's reported income of $201,000 to 249,000 a month from renting out the studio and equipment was reasonable. Vance, in turn, testified as to the longer-term value of the leasehold and relied in part on Matthews's estimations. Vance first took Falls's reported revenue for renting out the Studio B space along with the equipment for a 220-day period in 2015, then annualized it and subtracted expenses to arrive at a net profit of $304,000 a year. Vance then relied on Matthews's estimate that a long-term commercial lease of equivalent equipment (i.e., if Falls had had to replicate the equipment lease on the open market) would have cost about $22,500 a month. In that hypothetical situation, with that number drastically increasing his expenses, Falls would only be making $52,481 in yearly net profit. The value of the leasehold was calculated to be the difference between Falls's advantageous deal and the market conditions—$252,000 per year.

Vance then mapped out a model of slightly increasing revenue over time (complete with modeling the dip and recovery from the COVID-19 shutdowns) discounted future profits after a 2022 trial date to a present value, and subtracted the $500,000 that Falls had already received in lost business income coverage, out of a willingness to be conservative and fair. Vance's estimate assumed lease renewals through 2030, when Falls will be 50 years old. In sum, Vance concluded that the leaseholds in *both* the Studio B space and in the equipment (the interest in which is at stake here) were worth $2,295,797. Finally, Vance discounted this figure by a factor of .926 to capture only the equipment leasehold, as distinct from the studio space.[17]

---

[17]This discount figure compared the warranty deed value of the entire studio premises ($200,000) with the $2.5 million value of the insured equipment. The equipment was worth much more than the premises.

The district court found that this valuation was reasonable but reduced it further, relying on a factor of .9 based on Falls's testimony at trial, which estimated a value split between the BPP and Studio B space as "90/10 in favor of the equipment." DE 164, District Court Op., Page ID 4596–97 (quoting DE 156, Trial Tr., Page ID 4438). The final figure, allocating the $2,500,000, was $2,066,217.30 to Falls and $433,782.70 to Brown. This valuation method, which used both an income and market comparison approach, was permissible.

Hanover argues that Vance's calculations are too speculative because the lease terminated sometime before 2030—as set out above, either before the fire, because of the fire, or after the fire. But as we have shown, the parties' intent regarding repair and replacement controls distribution of insurance funds. And the probability of a leasehold's being renewed is properly considered a question of fact as to its value. At least one Tennessee court has stated, in the condemnation context, that evidence of the probability of a lease's renewal or cancellation is relevant to that question. *City of Johnson City v. Outdoor West, Inc.*, 947 S.W.2d 855, 859–60 (Tenn. Ct. App. 1996); *cf. Eller Media Co. v. City of Memphis*, No. W2007-02751-COA-R3-CV, 2008 WL 5330431, at *6 (Tenn. Ct. App. Dec. 22, 2008) (citing *Outdoor West*, 947 S.W.2d at 855–59). The district court did not err by valuing the leasehold as if it would have been renewed absent the fire: in these circumstances, it is proper to consider the probability of renewal as a component of the leasehold's value.

In this case, the evidence supports a conclusion that the advantageous leasehold would have been renewed. And such a likelihood was not impermissibly "remote or speculative." *Outdoor West*, 947 S.W.2d at 859. Falls testified that the equipment lease was a "ridiculously good deal," that Brown and Falls thought they "were trying to build something substantial," and that "the hope was to be there as a permanent fixture." DE 156, Trial Tr., Page ID 4360, 4390, 4431, 4433. Brown testified that, at least immediately after the fire, "restoring the studio was definitely the plan." *Id.* at Page ID 4367; *see also Hanover I*, 974 F.3d at 771 (recognizing that Falls and Brown both felt that they had a "'spectacular' working relationship"). And although Hanover is correct to cite *Norton v. McCaskill* for the proposition that "in the absence of a specific time designation in the lease, an option to renew remains effective only during the term

of the lease," this principle is not incompatible with valuing the leasehold as if it would have been properly renewed before termination by these parties.  12 S.W.3d 789, 790–91 (Ten. 2000).

We may affirm the district court on any grounds supported by the record.  *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 877 (6th Cir. 2020).  We hold that the district court's findings as to the valuation of the leasehold were not clearly erroneous.

## E.

The final issue in this case is the argument that was explicitly preserved in *Hanover I*: whether because of Tennessee equity principles, Brown's insurance-related misdeeds mean that any funds allocated to him need not be paid by Hanover.  Hanover cites *Box v. Lanier* for this proposition.  79 S.W. 1042, 1045 (Tenn. 1904) ("No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." (citation omitted)).  In *Box*, the wrong, iniquity, and crime was murder, and the court made an analogy to someone recovering insurance money after committing arson.  *Id.*  In this case, the jury in *Hanover I* found that Brown had made material misrepresentations as to the loss with intent to deceive and had made unlawful claims for payment.  *Hanover I*, 974 F.3d at 773–74.  Brown has also pled guilty to a federal mail fraud charge in connection with these insurance acts.  No. 2:20-CR-20245, DE 63 (W.D. Tenn. Sept. 20, 2023); DE 96 (W.D. Tenn. Oct. 17, 2024).

Brown argues that the jury found only that he had made misstatements in connection with the insurance policies for Studio A, and that he had nothing to do with the Studio B policies at issue in this case.  This is not the case.  Although Brown and Falls signed separate proofs of loss, they pulled from the same list of lost or damaged property, which became Exhibit 32 in the *Hanover I* trial.  *Hanover I*, 974 F.3d at 772.  Brown admitted on the stand that he had added "false" vendor information to theft claims for the BPP in Studio B to this list.  No. 2:16-CV-02817, DE 318, Trial Tr., Page ID 8720.  Brown's "forgery . . . on a grand scale" bars him from recovering insurance proceeds when he made false statements as to the lost value in BPP.  *Hanover I*, 974 F.3d at 773.  We affirm the district court on this point.

## IV.

This is a difficult case, but it follows from the decision and verdict in *Hanover I*, the application of Tennessee law to the unusual agreement at stake, and the district court's assessment of the testimony in this case. We affirm the district court's decisions that Hanover is precluded from making contractual interpretation arguments as to Falls, that the loss payee clauses do not require that all money flow to Brown, that the fire did not prevent Falls from recovering on his leasehold interest, that there was no clear error in the leasehold valuation, and that Tennessee public policy prevents recovery by Brown of the funds allocated to him.

We affirm the district court's decision.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 24-5452/5453

HANOVER AMERICAN INSURANCE COMPANY,

     Plaintiff - Appellant/Cross - Appellee,

v.

TATTOOED MILLIONAIRE ENTERTAINMENT, LLC;
CHRISTOPHER C. BROWN,

     Defendants - Appellees/Cross - Appellants,

JOHN FALLS,

     Defendant - Appellee (24-5452).

> **FILED**
> Sep 25, 2025
> KELLY L. STEPHENS, Clerk

Before:  CLAY, GIBBONS, and STRANCH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Tennessee at Memphis.

THESE CASES were heard on the record from the district court.  Counsel for Hanover American Insurance Company and John Falls argued their cases.  Tattooed Millionaire Entertainment and Christopher C. Brown waived oral argument and submitted their appeal on the briefs.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Kelly L. Stephens, Clerk